

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed April 15, 2020



**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 17-42439-MXM-7 |
| JESSICA GARCIA TREJO, | § | |
| | § | CHAPTER 7 |
| DEBTOR. | § | |
| JESSICA GARCIA TREJO, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | ADVERSARY NO. 17-4052 |
| | § | |
| NAVIENT AND THE UNITED STATES | § | |
| DEPARTMENT OF EDUCATION, | § | |
| | § | |
| | § | |
| DEFENDANTS. | § | |

## **MEMORANDUM OPINION**

The Court has conducted a trial on the Complaint[1] filed by Jessica Garcia Trejo ("**Ms. Trejo**") against the United States of America and its agency, the United States Department of Education ("**Education**"). By her Complaint, Ms. Trejo seeks a discharge of her federal student loans on the basis that excepting them from discharge would impose an undue hardship on Ms. Trejo and her dependents.[2]

The Court has reviewed and considered the pleadings and briefing filed in this adversary proceeding, the testimony of witnesses, the exhibits admitted into evidence, and the arguments of counsel. The following constitutes the Court's findings of fact and conclusions of law[3] in support of this ruling as required by Federal Rule of Civil Procedure 52, made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052.

Based on these findings of fact and conclusions of law, the Court has determined that Ms. Trejo has satisfied her burden of establishing "undue hardship" under the demanding standard adopted by the Fifth Circuit for interpreting and applying 11 U.S.C. § 523(a)(8).[4]

## I.      JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the standing order of reference in this district. This adversary proceeding involves a core matter over which the Court has both statutory and constitutional authority to enter final orders and judgments pursuant to 28 U.S.C. § 157(b)(2)(A) and (I). Venue for this adversary proceeding is proper pursuant to 28 U.S.C. § 1409(a).

---

[1] *Plaintiff's Amended Complaint to Determine Dischargeablity (sic)* [Adv. ECF No. 8] (the "**Complaint**").

[2] 11 U.S.C. § 523(a)(8).

[3] Any findings of fact that should be more appropriately be characterized as a conclusion of law should be regarded as such, and *vice versa*.

[4] *See Thomas v. Dep't of Educ. (In re Thomas)*, 931 F.3d 449 (5th Cir. 2019); *U.S. Dept. of Education v. Gerhardt*, 348 F.2d 89 (5th Cir. 2003); *see also Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987).

## II.     PROCEDURAL HISTORY

On June 8, 2017, Ms. Trejo filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code.[5]  That same day, Ms. Trejo filed her original complaint[6] against defendants Navient Solutions, LLC ("*Navient*") and Sallie Mae, initiating the instant adversary proceeding.

On June 28, 2017, Ms. Trejo filed her *Plaintiff's Notice of Dismissal of Sallie Mae.*[7]

On July 12, 2017, Ms. Trejo filed her amended Complaint, adding Education as a defendant.[8]  Thereafter, on July 28, 2017, Education filed its Answer[9] to the Complaint.

On January 2, 2018, Navient filed its motion to dismiss the Complaint,[10] which was granted on January 25, 2018.[11]

The trial on the Complaint against Education was conducted on October 17, 2018.

On November 15, 2018, the Court abated[12] the Adversary Proceeding based on an appeal that was then pending in the United States Court of Appeals for the Fifth Circuit in *Thomas v. Department of Education.*[13]

---

[5] *Voluntary Petition for Individuals Filing for Bankruptcy* [ECF No. 1].

[6] *Plaintiff's Complaint to Determine Dischargeablity (sic)* [Adv. ECF No. 1].

[7] Adv. ECF No. 7.

[8] Adv. ECF. No. 8.

[9] *United States of America's Answer to Plaintiff's Amended Complaint to Determine Dischargeability* [Adv. ECF No. 13] (the "*Answer*").

[10] *Navient Solutions, LLC's Motion to Dismiss "Navient" as a Defendant in this Adversary Proceeding or in the Alternative for Summary Judgment Dismissing "Navient" as a Defendant in this Adversary Proceeding and Brief In Support* [Adv. ECF No. 21].

[11] *Agreed Order on Motion to Dismiss* [Adv. ECF No. 23].

[12] *Order Abating Adversary Proceeding* [Adv. ECF No. 49]; *see also Order Further Abating Adversary Proceeding* [Adv. ECF No. 51].

[13] *In re Thomas*, 931 F.3d 449.

Following the Fifth Circuit's ruling in *Thomas*, the Court unabated[14] the Adversary Proceeding and set a post-trial briefing deadline of February 28, 2020.

### III. FINDINGS OF FACT[15]

#### A. Ms. Trejo and her Dependent Daughters

At the time of trial, Ms. Trejo was a forty-seven-year-old single mother[16] with three daughters: two dependent daughters ages twelve and fifteen, and a twenty-four-year-old daughter who is not a dependent of Ms. Trejo.[17] Neither Ms. Trejo nor her daughters receive any financial assistance or support from her daughters' father.[18] Both of Ms. Trejo's dependent daughters are afflicted with serious Type II diabetes, high blood pressure, psoriasis, eating disorders, severe depression, suicidal tendencies, and Attention-Deficit Hyperactivity Disorder.[19] Because of her daughters' depression and suicidal tendencies, their bedroom doors have been removed and Ms. Trejo must continually monitor their activities.[20]

Ms. Trejo testified credibly that both of her dependent daughters' physical, medical, and psychological challenges have grown progressively worse over the past few years as they have aged.[21] Ms. Trejo testified further that she believes she will be responsible as her daughters' primary caregiver long after they turn eighteen years old.[22]

---

[14] *Order Unabating Adversary Proceeding and Setting Post-Trial Briefing Schedule* [Adv. ECF No. 55].

[15] Some of the facts were proven at trial and some are from the *Statement of Stipulated Facts* section in the *Joint Pretrial Order* [Adv. ECF No. 45] ("***Stipulations***").

[16] *Id.* ¶ 1, at 4.

[17] *Id.* ¶ 3, at 5.

[18] Testimony of Ms. Trejo [9:41].

[19] Stipulations ¶ 5, at 5. *See also* testimony of Ms. Trejo [9:59-10:07].

[20] Testimony of Ms. Trejo [10:02-10:03; 10:17].

[21] Testimony of Ms. Trejo [9:59–10:12; 10:16-10:18; 10:24].

[22] Testimony of Ms. Trejo [10:07-10:12; 10:16-10:19].

As further corroboration of Ms. Trejo's testimony regarding her daughters' substantial disabilities, both daughters have been receiving Supplemental Security Income ("**SSI**")[23] benefits from the Social Security Administration in the amount of $735 per child per month for approximately four years.[24]

## B.     Ms. Trejo's Education and Student Loans

Ms. Trejo did not finish high school,[25] but years after attending high school, Ms. Trejo obtained a General Education Development (GED) high school equivalency certificate.[26]  Ms. Trejo testified that in 2008, "I started college because of my kids, I wanted . . . to show [them] to do better . . . I wanted to do better."[27]  Ms. Trejo's ultimate educational goal was to pursue a bilingual education degree and eventually work with children in childcare centers.[28]

From 2008 through 2013, Ms. Trejo attended the following institutions, part-time, and received the following student loan proceeds:

2008:   Ms. Trejo received $11,784.00 in student loans from Education to attend Tarrant County College.[29]

2009:   Ms. Trejo received $6,941.00 in student loans from Education to attend Tarrant County College.[30]

2010:   Ms. Trejo received $5,249.00 in student loans from Education to attend Tarrant County College.[31]

---

[23] The SSI program pays benefits to disabled adults and children who have limited income and resources.  *See* ssa.gov/benefits/ssi (last visited April 15, 2020).

[24] Stipulations ¶ 8, at 5.

[25] Testimony of Ms. Trejo [9:41].

[26] Testimony of Ms. Trejo [9:45].

[27] Testimony of Ms. Trejo [9:44].

[28] Stipulations ¶¶ 13 & 16, at 5-6.

[29] *Id.* ¶ 21, at 6.

[30] *Id.* ¶ 22, at 6.

[31] *Id.* ¶ 23, at 6.

2011: Ms. Trejo received $10,195.00 in student loans from Education to attend Texas Wesleyan University.[32]

2012: Ms. Trejo received $10,500.00 in student loans from Education to attend Hill College.[33]

2013: Ms. Trejo received $9,500.00 in student loans from Education to attend Hill College.[34]

Although Ms. Trejo took classes over a six-year period from 2008-2013, she has not earned a degree.[35] Further, Ms. Trejo testified that because of her family and financial situation, she no longer intends to return to college or obtain a degree.[36]

In addition to taking out the above student loans for herself, in 2015 Ms. Trejo signed a $13,522.00 Parent PLUS loan on behalf of her oldest daughter.[37] Ms. Trejo's oldest daughter had been attending Texas Wesleyan University on a scholarship, but since her scholarship did not cover her last semester, the only way to attend her last semester of college and obtain her degree was if Ms. Trejo signed the Parent PLUS student loan.[38] Because Ms. Trejo signed the Parent PLUS loan, her oldest daughter was able to complete her last semester of college and earn her degree.[39]

As of the trial date, Ms. Trejo owed $83,442.65 in principal and $7,156.15 in interest, for a total student loan debt of $90,598.80.[40] Ms. Trejo testified credibly that to date, she has not had the ability to make payments on her student loans.[41] Although Ms. Trejo has not had the ability

---

[32] *Id.* ¶ 24, at 6.

[33] *Id.* ¶ 25, at 6.

[34] *Id.* ¶ 26, at 7.

[35] Testimony of Ms. Trejo [9:46–9:47].

[36] Testimony of Ms. Trejo [10:12].

[37] Stipulations ¶ 27, at 7.

[38] Testimony of Ms. Trejo [9:43].

[39] Testimony of Ms. Trejo [10:06]. Neither Ms. Trejo nor Education offered any evidence on whether Ms. Trejo's oldest daughter has made any payments on the Parent PLUS loan.

[40] Testimony of Ms. Chan [10:41].

[41] Testimony of Ms. Trejo [10:14].

to make any payments on her student loan debt,[42] she has successfully obtained several payment "deferrals" and "forbearances" on her student loans over the years.[43]

Ms. Trejo testified that over the past five to seven years, she has been in constant telephone contact with Sallie Mae, Navient, and Education seeking to explore more long-term, income-based repayment options for her student loans.[44] Ms. Trejo testified that her efforts, however, were frustrating and not successful because on her telephone calls, she would either be transferred from one representative to another, the representative would give her another telephone number to call, the representative was not able to find her student loans in their system, or the representative told her that her loans had been assigned or merged.[45] In addition, Ms. Trejo was told that she could obtain the necessary documents to seek a more long-term solution to her student loan debt from the lender's website. Since Ms. Trejo does not own a computer, however, she asked that the lender mail her the necessary documents.[46] Ms. Trejo testified that despite her repeated requests for such documents to be mailed to her, she never received any such paperwork in the mail from any of the lenders.[47] Rather, the only documents she ever received in the mail regarding her student loans were bills.[48]

Education disputes that Ms. Trejo made a good-faith effort to seek a long-term repayment solution for her student loans. Ms. Gin Say Chan ("**Ms. Chan**"), a loan analyst for Education,

---

[42] Stipulations ¶ 28, at 7.

[43] *Id.* ¶ 29, at 7. According to Ms. Chan, when a "deferral" is granted, the United States government pays the accrued interest during the deferral period, whereas, when a "forbearance" is granted, the borrower must pay the interest during the forbearance period. *See* Testimony of Ms. Chan [10:37-10:38].

[44] Testimony of Ms. Trejo [10:12-10:13].

[45] Testimony of Ms. Trejo [10:13].

[46] Testimony of Ms. Trejo [10:13].

[47] Testimony of Ms. Trejo [10:13].

[48] Testimony of Ms. Trejo [10:13].

testified that, although Ms. Trejo had received short-term deferrals and forbearances, Education's records reflect that numerous applications and notices for long-tern repayment solutions had been sent to Ms. Trejo, but Education received no response from Ms. Trejo.[49]  Ms. Chan, however, never personally spoke with Ms. Trejo.[50]

Ms. Chan testified further that based on Ms. Trejo's circumstances, she is eligible for an immediate write-off of the Parent PLUS student loan obligation she had incurred for her oldest daughter.[51]  In addition, with respect to her personal student loan debt, based on Ms. Trejo's income and expenses reported in her bankruptcy schedules, she is eligible for an income-based payment plan of $0.00 per month for the next twenty-five years "as long as her income doesn't drastically increase as well as her family size doesn't change."[52]  Ms. Chan testified that so long as Ms. Trejo provided annual certifications of her income during the twenty-five-year term, then at the end of the term, Ms. Trejo's outstanding student loan debt would be forgiven by Education.[53]

## C.  Ms. Trejo's Work Experience, Income, and Expenses

Ms. Trejo has not held a full-time job in the last fifteen years.[54]  Since she stopped taking college courses in 2013, Ms. Trejo has been able to work only sporadically, part-time at the Nail Tech nail salon as an interpreter.[55]  According to Ms. Trejo's tax returns[56] and bankruptcy schedules, Ms. Trejo's income from Nail Tech since 2013 was:

---

[49] Testimony of Ms. Chan [10:40].

[50] Testimony of Ms. Chan [10:43].

[51] Testimony of Ms. Chan [10:39-10:40].

[52] Testimony of Ms. Chan [10:42].

[53] Testimony of Ms. Chan [10:41-10:43].

[54] Testimony of Ms. Trejo [9:42].

[55] Testimony of Ms. Trejo [9:47-9:48].

[56] Ms. Trejo testified that she believes the income from Nail Tech reflected on each of her Federal Income Tax Returns for 2013-2015 was overstated.  For purposes of this opinion, however, the Court did not find Ms. Trejo's testimony disputing the income reflected in her Federal Income Tax Returns all that persuasive.  Therefore, for purposes of this

2013—$12,560;[57]

2014—$12,490;[58]

2015—$15,200;[59]

2016—$15,900;[60] and

2017—$0.00.

Ms. Trejo testified credibly that, given the escalation of her daughters' physical, medical, and psychological conditions, she is no longer able to work even part-time.[61] Without part-time work, each month Ms. Trejo and her dependent daughters rely solely on (i) her daughters' SSI government assistance in the total amount of $1,470,[62] (ii) food stamps worth $210,[63] and (iii) occasional assistance from local churches to pay random utility bills and provide her with food.[64]

---

opinion, the Court finds that the Federal Income Tax Returns accurately reflected Ms. Trejo's income from Nail Tech for each year represented. Further, Education argued strenuously that reflected in Ms. Trejo's 2013 Federal Income Tax Return was $3,706 of gambling income. *See* Education Ex. 1, at 4. In response to cross-examination by Education's counsel, Ms. Trejo testified that the gambling winnings reflected in her 2013 tax return was her mother's gambling winnings as opposed to Ms. Trejo's winnings. Ms. Trejo testified adamantly and persuasively that she did not, nor does she, participate in gambling activities. *See* Testimony of Ms. Trejo [9:57]. Although the Court found Ms. Trejo's testimony credible that she has not gambled and does not gamble, her testimony regarding why her mother's gambling winnings were reflected in Ms. Trejo's 2013 Federal Tax Return was troubling. Given the highly charged implication gambling could have in a case like this, the Court gave heightened scrutiny to this evidence and testimony. The Court is troubled by the mere hint of gambling and gave that fact substantial weight. But after fully considering all the admissible evidence, testimony, and arguments of counsel, the Court finds that the $3,706 of gambling winnings reflected in Ms. Trejo's 2013 Federal Income Tax Return, by itself, was not sufficient to cast doubt on the substantial weight of credible admissible evidence and testimony that support this Court's ultimate conclusions in this case.

[57] *See* Education Ex. 1.

[58] *See* Education Ex. 2.

[59] *See* Education Ex. 3; *see also* Education Ex. 4 at 31, line 4.

[60] *See* Adv. ECF No. 1; *see also* Education Ex. 4 at 30, line 4.

[61] Testimony of Ms. Trejo [9:47-9:48; 10:24].

[62] *See* Adv. ECF No. 1 at 26, line 8f; *see also* Education Ex. 4 at 26, line 8f.

[63] *See* Adv. ECF No. 1 at 26, line 8f; *see also* Education Ex. 4 at 26, line 8f.

[64] Testimony of Ms. Trejo [10:29-10:30].

9

Finally, Ms. Trejo's uncontroverted testimony established that the monthly expenses for Ms. Trejo and her dependent daughters total $1,750.[65]

Aside from sporadic part-time work at the nail salon, it has been more than fifteen years since Ms. Trejo held a full-time job.[66]  Further, even if Ms. Trejo were able to spend less time with her dependent daughters and seek full-time, or even part-time employment, given Ms. Trejo's severely limited education and dearth of job experience and skills, any future financial recovery appears extremely unlikely.

## IV.    CONCLUSIONS OF LAW

Ms. Trejo's student debt loans constitute "an educational . . . loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution" as provided by 11 U.S.C. § 523(a)(8)(A)(i).  To discharge such a debt, a debtor must show that the debt, if excepted from discharge, would impose an "undue hardship" on the debtor and the debtor's dependents.[67]

Although the Bankruptcy Code does not define the term "undue hardship," this Court is bound by the Fifth Circuit precedent requiring a debtor seeking an "undue hardship" discharge of student loan debt under § 523(a)(8) to establish:

---

[65] Adv. ECF No. 1 at 26, line 8f.
[66] Testimony of Ms. Trejo [9:42].
[67] 11 U.S.C. § 523(a)(8).

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if forced to repay the loans;

(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

(3) that the debtor has made good faith efforts to repay the loans.[68]

This three-prong test, passed down by the Second Circuit in *Brunner v. New York State Higher Education Services Corp.*,[69] is commonly referred to as the *Brunner* test and is controlling law in this Circuit as construed in *Thomas* and *U.S. Department. of Education v. Gerhardt.*[70] Ms. Trejo bears the burden of proof to establish that all three prongs of the *Brunner* test have been satisfied.[71] And the Fifth Circuit has made clear that Congress "clearly evinces an intent to limit bankruptcy's use as a means of offloading student loan debt except in the most compelling circumstances."[72] If Ms. Trejo fails to establish one prong of the *Brunner* test, then her student loan debt cannot be discharged under an "undue hardship" theory.

### 1.    *Minimal Standard of Living*

Under the first prong of the *Brunner* test, Ms. Trejo is required to establish that she will not be able to maintain "minimal standards of living" if forced to repay her student loans.[73] Tight finances is not enough. Generally, maintaining a minimal standard of living requires that a debtor be able to purchase "basic necessities,"[74] but what qualifies as a basic necessity varies among

---

[68] *In re Thomas*, 931 F.3d at 451; *In re Gerhardt*, 348 F.3d at 92 (citing *Brunner,* 831 F.2d at 396).

[69] 831 F.2d 395.

[70] 348 F.2d 89.

[71] *Kettler v. Great Lakes Higher Educ. Serving Corp. (In re Kettler)*, 256 B.R. 719, 723 (Bankr. S.D. Tex. 2000).

[72] *In re Thomas*, 931 F.3d at 455.

[73] *In re Gerhardt*, 348 F.3d at 92.

[74] *Id*.

courts. Some courts adopt a narrow view, including only food, clothing, housing, and medical treatment.[75] Other courts are more generous and have held that basic necessities should also include transportation, hygiene expenses, and modest recreation.[76] Under either definition, courts agree that after purchase of basic necessities, a debtor may not use any discretionary income to the detriment of her student loan creditors.[77] If some "belt-tightening" in the debtor's expenses could create an ability to repay, she cannot satisfy the first prong.[78] But the debtor does not need to live in a state of poverty to satisfy the "minimal standard of living" prong.[79] Given the absence of "bright lines," perhaps the best that can be said is that "a minimal standard of living lies somewhere between poverty and mere difficulty."[80]

In making this case-by-case determination, the Fifth Circuit has concluded that where a debtor's expenses exceed her income, the first prong of *Brunner* has been satisfied.[81] This conclusion flows logically from the test above, because after subtracting necessary expenses, there is no discretionary income to pay towards student-loan creditors. But while perhaps sufficient, having expenses that exceed a debtor's income is not a necessary element. For instance, in *McMullin v Department of Education*,[82] the court found that a single fifty-one-year-old man satisfied the "minimal standards of living" prong even though he had a monthly discretionary

---

[75] *See Kuznicki v. Educ. Credit Mgmt. Corp. (In re Kuznicki),* 483 B.R. 296, 300-01 (W.D. Pa. 2012).

[76] *See Crawley v. Educ. Credit Mgmt. Corp. (In re Crawley)*, 460 B.R. 421, 436 (E.D. Pa. 2011) (citing *In re Ivory*, 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001)).

[77] *Id.*

[78] *In re Kuznicki*, 483 B.R. at 301.

[79] *In re Crawley*, 460 B.R. at 436; *Little v. U.S. Dep't of Educ. (In re Little)*, 607 B.R. 853, 859 (Bankr. N.D. Tex. 2019).

[80] *In re Crawley*, 460 B.R. at 436.

[81] *See In re Gerhardt*, 348 F.3d at 92.

[82] 316 B.R. 70 (Bankr. E.D. La. 2004).

12

income of $168 because, looking at the facts in their totality, he was in poor health and so close to retirement.[83]

In this case, Education claims that Ms. Trejo does not meet the "minimum standard of living" prong because she (theoretically) receives discretionary income each month. According to Education, between 2013 and 2016, Ms. Trejo received an average of $35,500 annually from four sources—$13,200 from her part-time work at Nail Tech nail salon, $17,640 in SSI government assistance for her dependent daughters, $4,644 in Earned Income Tax Credit, and $210 in food stamps.[84] Based on years 2013-2016, Education asserts that Ms. Trejo's current monthly income is (theoretically) about $2,959. Then, after subtracting Ms. Trejo's monthly expenses of $1,750 for a family of three, Education concludes that Ms. Trejo (theoretically) enjoys discretionary income of about $1,200 per month.

The credible evidence before the Court, however, contradicts Education's income analysis. First, Education ignores the uncontroverted evidence at trial that, because of her daughters' worsening medical and psychological challenges, Ms. Trejo no longer holds the part-time job she held at Nail Tech in 2013-2016. Second, Education downplays the reality of Ms. Trejo's daily struggle concerning her dependent daughters' uncontroverted physical, medical, and psychological health challenges. The uncontroverted evidence presented at trial was that the total monthly income currently received by Ms. Trejo and her dependent daughters is only (i) her daughters' SSI government assistance in the total amount of $1,470,[85] (ii) food stamps worth

---

[83] *Id*. at 75.

[84] Also included in Education's analysis is the $3,706 of "other income" included in Ms. Trejo's 2013 Federal Income Tax Return for alleged gambling earnings. *See supra* note 56 and accompanying text for a summary of this Court's findings and conclusions regarding the gambling earnings referenced in Ms. Trejo's 2013 Federal Income Tax Return.

[85] *See* Adv. ECF No. 1 at 26, line 8f; *see also* Education Ex. 4 at 26, line 8f.

13

$210,[86] and (iii) occasional assistance from local churches to pay random utility bills and provide her with food.[87] As a result, Ms. Trejo struggles each month to pay the meager monthly expenses of $1,750 for her family of three.

Given the uncontroverted factual reality in this case, there is simply no realistic "belt tightening" that Ms. Trejo can achieve to create discretionary income that will enable her to pay Education. As in *McMullin,* viewing Ms. Trejo's current condition in its totality, it is abundantly clear that because of her compelling circumstances, she would be unable to maintain a "minimal standard of living" if she were forced to repay her student loans. It is for these reasons the Court concludes that Ms. Trejo has satisfied the first prong of the *Brunner* test.

### 2. *Additional Circumstances*

Lying at the "heart of the *Brunner* test,"[88] the second prong requires that a debtor demonstrate "additional circumstances" that indicate the debtor's condition "is likely to persist for a significant portion of the repayment period of the student loans."[89] To do so, the debtor must show that extenuating circumstances affect her future earning potential and that these circumstances "were either not present when the debtor applied for the loans or have since been exacerbated."[90] Thus, looking prospectively, the Fifth Circuit test asks whether the debtor possesses "a total incapacity" to pay future debts "for reasons not within [her] control"[91]

---

[86] *See* Adv. ECF No. 1 at 26, line 8f; *see also* Education Ex. 4 at 26, line 8f.

[87] Testimony of Ms. Trejo [10:29-10:30].

[88] *In re Little*, 607 B.R. at 859.

[89] *Brunner*, 831 F.2d at 396.

[90] *In re Gerhardt*, 348 F.3d at 92.

[91] *Id*.

considering the debtor's "age, education, work history, health, assets, ability to obtain a higher paying job or reduce expenses, and other circumstances."[92]

Essentially, where the debtor has untapped earning potential, this prong cannot be satisfied.[93] For instance, where a debtor can attain any job, whether in her chosen field or not, that would allow her to make any payment toward her student loans, the second prong cannot be met.[94] But where the debtor demonstrates that "psychiatric problems, lack of usable skills, [or a] severely limited education"[95] has a negative impact on future earning potential, a court may find that the debtor's current economic hardships are likely to persist into the future, thus meeting the second prong.[96]

For example, in *Jones v. Bank One Texas*,[97] the debtor was a single, stay-at-home mother.[98] While the debtor had previously held management positions, she chose not to look for employment after her son's birth and, instead, chose to attend community college in pursuit of a nursing degree.[99] At the time of her filing, the debtor was two years away from graduating, and relied primarily on social security, housing assistance, food stamps, and other aid to provide for herself and her son.[100] The court in *Jones* noted the debtor's lack of education, job skills, and her

---

[92] *Educ. Credit Mgmt. Corp. v. Pratt (In re Pratt)*, 375 B.R. 753, 761 (S.D. Tex. 2007).

[93] *See, e.g.*, *In re Thomas*, 931 F.3d at 452-53 (debtor had ability to work in sedentary work environment despite prior employers' refusal to accommodate her physical condition); *Educ. Credit Mgmt. Corp. v. Young*, 376 B.R. 795, 800 (E.D. Tex. 2007) (debtor had not maximized his income, despite being employed, because he failed to obtain a Texas law license); *Jones v. Bank One Texas.*, 376 B.R. 130, 138-39 (W.D. Tex. 2007) (debtor's reliance on her age and dependent was insufficient because she was unemployed and could obtain at least a part-time job).

[94] *See Jones*, 376 B.R. at 140.

[95] *In re Gerhardt*, 348 F.3d at 92 n. 2.

[96] *See McMullin v. Dep't of Educ. (In re McMullin)*, 316 B.R. 70, 76–78. (Bankr. E.D. La. 2004) (citing *In re Gerhardt*, 348 F.3d at 92).

[97] 376 B.R. 130 (W.D. Tex. 2007).

[98] *Id*. at 133.

[99] *Id*. at 133–34.

[100] *Id*. at 134.

dependent son, but the court found that raising one healthy child was not sufficient to meet the second prong of *Brunner*.[101] Further, the debtor's lack of education and job skills was similarly unavailing. While the debtor had not yet completed school, and was not guaranteed to graduate and get a nursing job, her previous work experience could merit some job that would allow the debtor to make "some kind of payment."[102] Without any health problems or lack of job skills, the debtor's untapped earnings potential suggested a free choice not to work, rather than circumstances beyond the debtor's control.[103]

On the other hand, the court in *McMullin* found that the debtor's health and lack of job skills posed such an obstacle to future employment and earning potential that he had satisfied the second prong.[104] There, the debtor took out several student loans to pursue a degree in management. However, the debtor testified that his physical and mental health prevented him from working in this field and drove him into employment as a truck driver. Mentally, bipolar disorder and depression prevented him from working with people and thus inhibited his ability to work in his field of training. Physically, while working as a truck driver provided income, the debtor suffered from physical conditions that made future employment unlikely. Namely, the debtor suffered from severe obesity, sleep apnea, hypertension, and degenerative disk disease. According to the court, these conditions, along with the mental issues, imposed a financial burden that was not self-inflicted.[105] Further, the debtor's long-term financial prognosis was poor. The

---

[101] *Id*. at 138.

[102] *Id*. at 140.

[103] *Id*.

[104] *In re McMullin*, 316 B.R. at 76–78.

[105] *Id*. at 78.

debtor's mental and physical health continued to decline, and along with it came an inevitable decline in the debtor's earning potential.[106]

In this case, Ms. Trejo's financial condition is more akin to that in *McMullin*, where her financial distress is not self-imposed. Ms. Trejo's future earnings potential is stalled due to the physical, medical, and psychological challenges of her dependent children, her severely limited education, and the dearth of her usable job skills. Unlike the debtor in *Jones*, Ms. Trejo has not chosen unemployment. Instead, the physical, medical, and psychological health disabilities of her two dependent daughters have actively prevented Ms. Trejo from remaining in the workforce. In stark contrast to the debtor with a healthy child in *Jones*, Ms. Trejo must constantly supervise her dependent daughters whose conditions make them unstable and a danger to themselves. Looking forward, Ms. Trejo testified that her daughters' physical, medical, and psychological health challenges are unlikely to improve. According to Ms. Trejo's uncontroverted testimony, her daughters' conditions have gotten progressively worse since their initial diagnosis. While some of the loans may have been taken out when her daughters were beginning to be diagnosed with some of their health challenges, Ms. Trejo did not anticipate, and could not have anticipated, such a steep decline in her daughters' physical, medical, and psychological health.

Due to the worsening of her daughters' conditions, and her uncontroverted lack of job experience or skills and her severely limited education, Ms. Trejo's financial woes appear likely to persist for a significant portion of the repayment period of her student loan debt. Again, Ms. Trejo testified that her daughters' conditions are not expected to improve, but rather deteriorate in the future. But even if her daughters' conditions disappeared tomorrow, allowing her to join the

---

[106] *Id.*

workforce, Ms. Trejo and her family would lose the $1,470 per month SSI disability income, and Ms. Trejo does not possess the work history, education, or usable job skills to obtain a higher-paying job that would exceed the $1,470 per month her daughters receive in SSI disability income. And given their meager monthly budget for a family of three, Ms. Trejo will not be able to reduce expenses. Unlike the experienced debtor in *Jones*, Ms. Trejo testified that, even before her daughters' conditions became apparent, she had not held a full-time job in nearly fifteen years. Recognizing her lack of education and job skills or experience, Ms. Trejo understandably looked to community college to create a better life for herself and her dependent daughters. Unfortunately, Ms. Trejo was unable to secure a degree, which leaves Ms. Trejo in the untenable position of seeking employment with limited education, no usable job skills, experience, or formal training.

Taken together, Ms. Trejo has demonstrated that, by no fault of her own, she has no untapped earning potential. For the foreseeable future, which is likely to persist for a significant portion of the repayment period of her student loan debt, Ms. Trejo cannot even take a part-time job without risking the physical, medical, and psychological health of her dependent daughters, who rely on their mother for support. But even if Ms. Trejo could find work, due to her lack of education and job skills, she would be confined to low-paying jobs. While Education boldly assumes that, in theory, any job is better than none, just any job paying below a certain threshold would not, in practice, serve to increase Ms. Trejo's earning potential. To the contrary, earnings up to a certain amount (an amount Ms. Trejo is unlikely to cross) would only be counted against the government assistance upon which Ms. Trejo and her dependent daughters currently rely to provide their basic needs. Thus, Education's position asks an absurdity of Ms. Trejo—at the risk of your dependent daughters' health and well-being, find a job that will do nothing to alleviate your financial difficulties.

18

Ms. Trejo's age, severely limited education, lack of job skills and experience, along with the additional physical, medical, and psychological health challenges presented by her dependent daughters, establish compelling circumstances that saddle Ms. Trejo with a total incapacity to pay her student loan debts. There exists no realistic, foreseeable avenue through which Ms. Trejo could improve her condition and reach some untapped earning potential that would allow her to pay down her student loan debt without jeopardizing herself or her dependents. Instead, the compelling circumstances and the unfortunate financial conundrum in which Ms. Trejo finds herself are likely to persist for a significant portion of the repayment period of her student loan debt. Therefore, given her unfortunate circumstances, it is apparent that Ms. Trejo faces not mere financial straits, but instead compelling circumstances and insurmountable barriers to financial recovery. It is for these reasons the Court concludes that Ms. Trejo has indeed satisfied the demanding standard adopted by the Fifth Circuit when considering the second prong of the *Brunner* test.

### 3. *Good-Faith Effort to Repay*

*Brunner's* third prong requires the debtor to establish that she made good-faith efforts to repay the loans.[107] Although this Circuit has not specifically ruled on the *Brunner* third prong, courts within this Circuit have indicated that the overarching considerations for this prong include (i) "whether the debtor's default is the result of factors beyond [her] control,"[108] (ii) "the [d]ebtor's efforts to obtain employment, maximize income, and minimize expenses,"[109] and (iii) the debtor's

---

[107] *In re Thomas*, 931 F.3d at 451.

[108] *Gnahoua v. Dep't of Educ. (In re Gnahoua)*, No. 14-5020, 2016 WL 1238831, at *2 (Bankr. N.D. Tex. Mar. 28, 2016).

[109] *In re Little*, 607 B.R. at 861 (citing *In re Russ*, 365 B.R. 640, 645 (Bankr. N.D. Tex. 2007)).

repayment efforts,[110] including whether any payments were made and whether the debtor pursued forbearance, deferment, or otherwise attempted to renegotiate the terms of the loan.[111]

The first and second inquiries, much like the second prong of *Brunner*, ask whether the default on student loan payments was due to factors beyond the debtor's control by observing the steps the debtor took to pay her student loans, such as attempting to increase income and decrease expenses. As previously discussed, Ms. Trejo's circumstances did not allow her to obtain a better paying job, to increase income, or to decrease expenses from an already meager budget for a family of three. The uncontroverted evidence established that Ms. Trejo had a part-time job from 2013 up to just prior to filing for bankruptcy, but the evidence further established that the decline in her daughters' physical, medical, and psychological health forced Ms. Trejo out of the workforce to care for them. In addition, even if Ms. Trejo could somehow rejoin the workforce, given her limited education, job skills, training, and experience, there appears to be little Ms. Trejo can do to increase her income. Further, Education did not, nor can the Court, identify any expenses Ms. Trejo can trim from her already meager budget. Finally, Ms. Trejo does not generate enough income to provide basic necessities for herself and her dependent daughters, much less pay student loan debt, as evidenced by (i) Ms. Trejo's government assistance, and (ii) Education's acknowledgment that, based on Ms. Trejo's income and expenses, she would be obligated to make monthly payments of $0.00 on her student loans under a long-term, income-based repayment plan.

Third, courts consider whether the debtor, in fact, made any payments toward the student loan debt.[112] While making some payments certainly evidences a good-faith effort, mere "failure

---

[110] *Id.* (citing *O'Donohoe v. Panhandle-Plains Higher Educ. Auth. (In re O'Donohoe)*, No. 12-03281, 2013 WL 2905275, at *5 (Bankr. S.D. Tex. June 13, 2013)).

[111] *In re Russ*, 365 B.R. at 645–47.

[112] *Id.* at 646.

to make a payment, standing alone, does not establish a lack of good faith."[113] Generally, courts are sensitive to the fact that there may be no funds available to make payments.[114] In this case, the evidence is clear that Ms. Trejo did not have funds available to make payments on her student loans.

In cases where funds are not available to make payments, courts then look to whether the debtor pursued forbearance, deferment, or otherwise attempted to address the loans.[115] Often, requests for forbearance or deferments support good faith, but some courts have found that if these requests are not accompanied by attempts to renegotiate, such as applying for an income-based repayment plan, then that failure to renegotiate may indicate a lack of good faith.[116] Some courts, on the other hand, view a debtor's attempt to seek a more long-term, income-based repayment plan as just one factor to consider, while other courts view this factor as relatively insignificant.[117]

Here, given Ms. Trejo's financial condition, she did not have the funds available to pay her student loans. Although Ms. Trejo has not made any payments on her student loan debt,[118] the uncontroverted evidence established that, over the years, she successfully obtained several payment "deferrals" and "forbearances" on her student loans.[119] In response, Education argued

---

[113] *In re Little*, 607 B.R. at 861; *see also In re Russ*, 365 B.R. at 646.

[114] *See In re Russ*, 365 B.R. at 646.

[115] *Id*. (citing *In re Alderete*, 412 F.3d 1200, 1206 (10th Cir. 2005) and *In re McMullin*, 316 B.R. at 79).

[116] *Id*. at 646 (citing *In re Alderete*, 412 F.3d at 1206).

[117] *In re Crawley*, 460 B.R. at 436 (citing Michael & Phelps, *Judges?!–We don't need no stinking judges!!!*, 38 Tex. Tech. L. Rev. 73, 92-101 (2005)).

[118] Stipulations ¶ 28, at 7.

[119] *Id*. ¶ 29, at 7. According to Ms. Chan, when a "deferral" is granted, the United States government pays the accrued interest during the deferral period, whereas when a "forbearance" is granted, the borrower must pay the interest during the forbearance period. *See* Testimony of Ms. Chan [10:37-10:38].

that these were only short-term solutions, and that Ms. Trejo failed to seek any long-term solutions to satisfy the good-faith standard.[120]

There is contradictory evidence about Ms. Trejo's efforts to obtain a long-term solution. On the one hand, Ms. Trejo testified that over the past five to seven years, she has been in constant telephone contact with Sallie Mae, Navient, and Education seeking to explore more long-term, income-based repayment options for her student loans.[121] Ms. Trejo testified further that her efforts were frustrating and not successful because her telephone calls would be transferred from one representative to another, or the representative would give her another telephone number to call, or the representative was not able to find her student loans in their system, or the representative told her that her loans had been assigned or merged.[122] In addition, according to Ms. Trejo, because she did not own a computer or possess the ability to access documents on-line from the various lenders' websites, Ms. Trejo requested that the lenders mail any such available documents to her, but such paperwork never came.[123]

On the other hand, Ms. Chan testified that Education's records reflect that numerous applications and notices for long-tern repayment solutions had been sent to Ms. Trejo, but Education received no response from Ms. Trejo.[124]

The Court need not resolve this conflict in the testimony, however, because after considering the credible evidence in this case, the Court concludes that Ms. Trejo has satisfied the

---

[120] *See In re Little*, 607 B.R. at 861 ("requesting deferments and forbearances alone does not establish good faith."); *Tuttle v. Educ. Credit Mgmt. Corp., (In re Tuttle)*, 600 B.R. 783, 805 (Bankr. E.D. Wis. 2019) (obtaining deferment not enough to establish good faith "when it is not followed by payment or a significant effort to work out a payment schedule.").

[121] Testimony of Ms. Trejo [10:12-10:13].

[122] Testimony of Ms. Trejo [10:13].

[123] Testimony of Ms. Trejo [10:13].

[124] Testimony of Ms. Chan [10:40].

third prong of the *Brunner* test.  The Court's conclusion is based on the compelling circumstances in which Ms. Trejo finds herself and the uncontroverted good-faith efforts that she did make, including her numerous phone calls to her student loan lenders and her success in obtaining several payment deferrals and forbearances on her student loans over the years.  It is for these reasons the Court concludes that Ms. Trejo has indeed satisfied the demanding standard adopted by the Fifth Circuit when considering the third prong of the *Brunner* test.

## V.    CONCLUSION

Based upon the Court's findings of fact and conclusions of law and for all the foregoing reasons, the Court finds and concludes that Ms. Trejo has satisfied her burden of establishing "undue hardship" under the demanding standard adopted by the Fifth Circuit for interpreting and applying 11 U.S.C. § 523(a)(8).

The Court will enter a separate Judgment consistent with this Memorandum Opinion.

**# # #   END OF MEMORANDUM OPINION   # # #**